IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MID-STATE SURETY CORPORATION,      )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        Civil Action 01-240
                                   )
EAST BETHLEHEM TOWNSHIP            )
MUNICIPAL AUTHORITY, and           )
GANNETT FLEMING, INC.              )
                                   )
                Defendants,        )
                                   )
PALIOTTA GENERAL CONTRACTORS,      )
INC., INLAND WATERS POLLUTION      )
CONTROLS, INC., JOHN HAYS d/b/a    )
BULLS EYE CONSTRUCTION CO.         )
                                   )
                Third-party defendants.  )

MEMORANDUM ORDER

CONTI, District Judge

In this memorandum order, the court considers the final two cross-motions for summary judgment filed by the principal parties involved in this suit that arose out of a costly sewer project in East Bethlehem Township, Pennsylvania.[1]  Specifically, the court considers the cross-motions for summary judgment filed by defendant East Bethlehem Township Municipal Authority ("defendant" or "EBTMA") and plaintiff Mid-State Surety Corporation ("plaintiff" or "MSS").  EBTMA filed a motion for summary judgment with respect to the claims contained in

---

[1]     The court previously granted the motion for summary judgment filed by third-party defendant Inland Waters Pollution Controls, Inc.  See March 31, 2005 Mem. Op. (Doc. No. 171).  The court also previously granted in part and denied in part the motion for summary judgment filed by defendant Gannett Fleming.  See June 30, 2005 Mem. Op. (Doc. No. 189).

counts I, IV, V, VII, IX, X, XI and XII of plaintiff's complaint and the amendment to plaintiff's

complaint.[2]  Plaintiff in its response to the motion agreed that count V (negligence) should be

dismissed and disputes the remainder of defendant's arguments.  In addition, plaintiff filed a

motion for partial summary judgment with respect to counts I (breach of contract) and IX

(declaratory judgment) of its complaint and the counterclaim asserted in defendant's answer

(Doc. No. 21, ¶¶ 43-48).  After reviewing the submissions of the parties and the voluminous

record, plaintiff's motion for partial summary judgment shall be denied in its entirety.

Defendant's motion for summary judgment shall be granted as to count V (negligence) in its

entirety, and granted in part as to counts VII (negligent misrepresentation), X, (fraud) and XI

(civil conspiracy) of plaintiff's complaint regarding defendant's alleged misrepresentations as to

wildcat sewer lines and alleged failure to comply with the Pennsylvania One Call Act, PA. STAT.

ANN. tit. 73, §§ 176, *et seq.*   In all other respects defendant's motion shall be denied, and the

case shall be set for trial.

---

[2]      Plaintiff's claims against EBTMA include: breach of contract (count I); unjust
enrichment (count IV); negligence (count V); negligent misrepresentation (count VII); and
declaratory judgment (count IX).  Plaintiff also filed an amendment to the original complaint,
which added claims against defendant for fraud (count X), civil conspiracy (count XI), and
equitable rescission (count XII).  Defendant's motion for summary judgment challenges all of
plaintiff's claims.

*Background* [3]

## I.     The bid process for Contract #1

In 1991, a feasibility study was prepared with respect to the design of a new sanitary

sewer system in East Bethlehem Township, Pennsylvania.  EBTMA, the owner of the project,

retained Gannett Fleming ("GF") to provide engineering services on the project pursuant to an

engineering services agreement and various amendments to that agreement.  The project was

funded in part by Rural Utility Services ("RUS"), an agency of the United States Department of

Agriculture.  For planning, bidding, and construction purposes, the work on the project was

broken down into five different contracts:

- •     Contract #1 – Construction of Sanitary Sewers;[4]

- •     Contract #2 – Sewage Pump Stations;

- •     Contract #3 – Sewage Treatment Plant;

- •     Contract #4 – Plumbing and Heating for Plant; and

- •     Contract #5 – Electrical Work for Plant.

---

[3]     The statement of facts filed by the parties focuses exclusively upon the dispute over the proper interpretation of the Takeover Agreement between MSS and EBTMA.  The parties' respective briefs, however, reference the arguments made by MSS and Gannett Fleming ("GF") in GF's motion for summary judgment, including the statement of facts filed in accordance with that motion.  Accordingly, the court will briefly recite the facts set forth in its memorandum opinion issued on June 30, 2005 (Doc. No. 189), supplementing those facts with the additional evidence submitted by the parties with respect to the Takeover Agreement.  For a more extensive factual background relating to the negligence misrepresentation and fraud claims (counts VII and X of the complaint), the parties are directed to review the June 30, 2005 memorandum opinion.

[4]     Contract #1 was divided into four subparts: A, B, C and D.

In the original feasibility study in 1991, GF estimated the cost of Contract #1 at $3,586,000. The drawings that resulted from the 1991 feasibility study did not include any notations showing rock overhangs made by a previous engineer who prepared design plans for a sewer project in 1973. Over the next several years, communications took place between GF engineers and RUS engineer Korah Abraham regarding the proper cost per linear foot of the project. GF estimated that a cost of approximately $80 - $100 per linear foot was appropriate, while RUS asserted that a the correct price per linear foot was around $38 - $46. GF became concerned that RUS was "not taking into consideration that there is rock in the project area which will make the cost per linear foot higher." Monroe Dep. at 108-09; Pl.'s App. (Doc. No. 154) Ex. P, Dep. Ex. 45. Specifically, GF was concerned that bids might be higher than estimated project costs, and that the project would no longer be feasible.[5]

RUS, GF, and EBTMA eventually arrived at an "agreed upon" cost estimate of $7.1 million for the entire cost of the project. That amount included all project costs, construction costs, engineering costs, and legal costs. Of that amount, GF understood that $5.4 million was allocated for *construction costs* for the entire project. Despite this understanding, however, GF's project engineer prepared an estimate for *Contract #1* in the amount of $6.576 million in March 1996. The project engineer was subsequently instructed that GF did not "have the budget to argue" with RUS, and was directed to use "the figure in [the] Feasibility Report and concentrate on getting the job done." Monroe Dep. Ex. 77. Following some design changes, the next cost estimate GF prepared for Contract #1 – utilizing the same unit prices used in the March 1996

---

[5]      In addition, GF would not have been compensated for several years of time and expenses in the design phase (valued at $250,000) unless the bids were low enough to make the project economically feasible.

estimate – was $5.45 million.[6]  In 1999, GF prepared a final cost estimate.  The project manager who prepared the estimate, Jack Rae, determined that a unit cost of $50 per lineal foot was appropriate.  This estimate, however, was too high for the amount of funding available for Contract #1, which Rae determined to be $3.156 million.  In order to adjust the estimate to the amount of funding available, Rae made a mathematical calculation and reduced the unit cost to $42.09 per lineal foot.  That calculation was not based upon any reduction in the scope of the project or in response to any requested design changes; rather, the reduction was based solely upon the construction budget.  Rae Dep. at 52-53.

As explained more fully in the court's June 30, 2005 memorandum opinion regarding GF's motion for summary judgment, there is some evidence in the record that GF was aware of mismarked utility lines, unmarked "wildcat" sewer lines, and the existence of rock in the project area.  Regarding the problem with mismarked utility lines, RUS requested GF to place a caution note on the design plans so that bidders could adjust appropriately their bids.  A GF internal memorandum dated February 17, 1997, stated that GF was going to: "Place a notation on each plan sheet in a 'caution' format, that the owners of the various utilities may not know exactly where the utility is."  GF App. I (Doc. No. 136) Ex. 11.  GF did place a notation on the design drawings.  That notation, however, was standard language GF placed on all of its design drawings and did not refer specifically to the fact that utility lines on the drawings may be unmarked or mismarked.

Contract #1 was advertised for bid in two trade publications, Pittsburgh Construction News and The Dodge Report, respectively on July 20 and 23, 1999.  Pittsburgh Construction News listed the estimated price at $3.156 million for Contract #1, while The Dodge Report listed

---

[6]        The date at which this cost estimate was prepared is unclear from the record.

the estimated price for all five contracts at $5.4 million.  Paliotta General Contractors, Inc. paid

the requisite price of $200.00 and received a set of contract documents from GF.  At the time

Paliotta received the contract documents, its bonding capacity as set forth by its surety, MSS, was

$4 million.  Paliotta obtained a bid bond in the amount of 5% of the bid total from MSS prior to

submitting its bid, and Paliotta's eventual bid in the amount of  $3,847,347.55 was the low bid

for Contract #1.  After Paliotta was determined to be the low bidder, MSS requested Paliotta to

reevaluate its bid numbers because there was a spread between Paliotta's bid of approximately

$3.8 million and GF's estimate of approximately $3.2 million.  Paliotta reevaluated its bid,

specifically comparing its estimate to defendant's estimate, and subsequently informed MSS that

it was confident in its bid.  Paliotta claims that this confidence arose, in part, on the basis of a

comment made by GF's project manager that Paliotta's bid was "good" and "right in there."

Paliotta received a notice of intent to award the project contract from EBTMA on

November 2, 1999.  On December 30, 1999, Paliotta entered into a contract with EBTMA to

complete the construction of sanitary sewers in East Bethlehem Township (Contract #1).  Id. ¶ 7;

Pl.'s App. Ex. C.  MSS thereafter issued performance and payment bonds to Paliotta for Contract

#1.  Def.'s S.F. ¶ 8.[7]  Paliotta began work on the project and encountered large quantities of rock

and over 600 utility interferences.  Pl.'s App. Ex. H.  These interferences – which plaintiff claims

were known to EBTMA and GF and omitted from the design plans because of fraud and

negligence – impacted Paliotta's ability to meet it contractual obligations to EBTMA.[8]

_____

[7]      A payment bond guarantees the payment of subcontractors, suppliers, and
laborers.  A performance bond "guarantees that [the] contractor will fully perform contract and
guarantees against breach of contract."  BLACK'S LAW DICTIONARY 1138 (6th ed. 1990).

[8]      As discussed more fully in the court's June 30, 2005 memorandum opinion, the
parties dispute the extent to which Paliotta (and likewise plaintiff) should have expected rock and
utility interferences on the project.  The parties further dispute the degree to which plaintiff and

II.     **The Takeover Agreement**

A.      **The negotiations over the Takeover Agreement**

By early June 2000, it was apparent to all parties involved that Paliotta would be unable to meet its obligations under its contract with EBTMA, and that Paliotta would have to enter into voluntary default.[9]  In connection with this impending reality, MSS began negotiating the terms of a Takeover Agreement with EBTMA that would be correspondingly executed along with a letter establishing Paliotta's voluntary default.[10]  On June 23, 2000, B. Michael Bowen, claims manager for MSS faxed Stephen Regish of EBTMA a form copy of a proposed Takeover Agreement under which MSS would perform or procure the remaining work under the contract documents.[11]  Def.'s App. (Doc. No. 130) Ex. A at Dep. Ex. 3.  Paragraph 11 of that proposed document contained the following pertinent language:

> 11.     Obligee agrees that under no circumstances shall Surety's liability exceed the penal sum of its Bond and that all payments made by Surety to any person or entity on account of the work covered by the Contract shall be deemed to be payment under Surety's Bond and shall reduce the penal sum of the Bond in an equal amount.  Surety shall not indebt Obligee to any third party for work in excess of the penal sum of the Bond.

Id.

---

Paliotta should have relied solely upon the design drawings and representations of GF in the face of contractual provisions that sought to limit EBTMA and GF's liability for underground interferences.

[9]     It appears that, by early June, Paliotta was unable to meet its obligations under the payment bond, and that MSS was required to step in under its payment bond obligations.  See Def.'s App. Ex. A., Dep. Ex. 21; see also Bowen Dep. at 45-46.

[10]    Paliotta's voluntary default would trigger MSS's obligations under the performance bond, thus necessitating the need for a Takeover Agreement.

[11]    The fax cover sheet was dated June 22, 2000.  The "stamp" at the top of the fax, however, indicates it was sent at 2:56 p.m. on June 23, 2000.  Id.

There is no further correspondence in the record between the parties regarding the June 23, 2000 fax.  On July 10, 2000, Bowen faxed another form takeover agreement to Regish for his consideration.  Pl.'s App. Ex. F.  That form agreement contained the identical proposed provision (paragraph 11) referenced above.  Id.  Regish immediately faxed the form agreement to GF and RUS.  Def.'s App. A, Dep. Ex. 5.  The next day, RUS sent an email to GF and a fax to EBTMA indicating its "SERIOUS concerns" regarding the proposed agreement.  Id. Ex. A, Dep. Ex. 6 (capitalization in original).  RUS explicitly stated that the language of proposed paragraph 11 was "UNACCEPTABLE."  Id. (capitalization in original); Pl.'s App. Ex. G.[12]  In a letter dated July 21, 2000, Josh Carroll, Esq., EBTMA's attorney, responded to plaintiff's proposed takeover agreement.  In the letter, Carroll stated that EBTMA and RUS had several concerns over provisions in the proposed takeover agreement, and that, because RUS was the funding agency for the project, RUS was required to concur in any takeover agreement entered into by EBTMA.  Pl.'s App. Ex. G.  Carroll attached to the letter the "list of concerns" raised by RUS.   In order to avoid problems with the proposed agreement, Carroll suggested that Paliotta's contract with EBTMA be assigned to Inland Waters Pollution Controls, Inc, plaintiff's proposed completion contractor.  Id.

---

[12]     Specifically, RUS stated:

- - Clause 11: THIS PROVISION IS UNACCEPTABLE.  This eliminates the automatic escalation of the bonding capacity as expressly provided in the performance and payment bonds, and may also serve to limit obligations during the required one-year period following contract completion.

Id. (capitalization in original).

On July 26, 2000, Bowen sent Carroll a copy of a takeover agreement that MSS had entered into with respect to another project.  Paragraph 21 of that agreement, which contained language regarding the surety's liability under the takeover agreement, stated as follows:

> 21.     Obligee agrees that the Surety's liability will not exceed the penal sum of the Performance Bond and that all payments made in excess of those amounts paid by Obligee to the Surety . . . shall be deemed to be payment under the Surety's Performance Bond and shall reduce the penal sum of the Performance Bond in an equal amount.  Surety shall not contract with the Completion Contractor for any extra work without prior written consent of the Obligee.

Pl.'s App. Ex. H.  Peter Thomson, counsel for Paliotta, faxed Carroll a letter on August 4, 2000, which stated that a takeover agreement had to be finalized or Paliotta would seek delay damages under the contract.  Rev'd Jt. Stip. Facts (Doc. No. 188) ("R.J.S.F.") ¶ 11; Def.'s App. Ex. A, Dep. Ex. 11.  That same day, Carroll drafted a proposed takeover agreement using the previous drafts proposed by MSS and the comments to those drafts provided by RUS, GF, and EBTMA.  The next day, August 5, 2000, Carroll faxed the proposed takeover agreement to Thomson and Barbara McMillen at RUS.  R.J.S.F. ¶ 12.  Carroll's proposed agreement did not contain any limitation of MSS's liability as to the penal sum as previously set forth in the three MSS proposed takeover agreements.  Id.

Thomson responded to Carroll's draft on Monday, August 7, 2000.  In a letter to Carroll, Thomson stated that MSS required the language set forth in paragraph 11 of MSS's proposals on June 23, 2000 and July 10, 2000, in order to reach an agreement.  Id. ¶ 14; Pl.'s App. Ex. I. [13]

---

[13]     As stated, supra, paragraph 11 stated as follows:

Obligee agrees that under no circumstances shall Surety's liability exceed the penal sum of its Bond and that all payments made by Surety to any person or entity on account of the work covered by the Contract shall be deemed to be payment under Surety's Bond and shall reduce the penal sum of the Bond in an equal amount.  Surety shall not indebt Obligee to any third party for work in

The next day, Thomson sent Carroll another letter, in which he indicated he received a fax from McMillen objecting to the language set forth in the August 7, 2000 letter. Thomson's letter stated that he "worked out a solution" with RUS, and requested that the following language be added to EBTMA's proposed takeover agreement:

> Obligee agrees that under no circumstances shall Surety's liability exceed the penal sum of its Performance Bond. The balance of the contract price must be exhausted before the penal sum *is reduced*. Surety shall not indebt Obligee to any party to pay for work in excess of the penal sum of the Performance Bond.

Def.'s App. Ex. 1, Dep. Ex. 15 (emphasis added). This proposed language constituted a "third option" – i.e., it provided that based upon the contract balance (at that time, approximately $2.5 million) and the penal sum of the performance bond (approximately $3.5 million), EBTMA had enough coverage to complete the project. Def.'s App. Ex. A at 69-70. Under this option, the penal sum would be reduced once MSS made payments for work which were not reimbursed under the original contract. R.S.J.F. ¶ 17.

Carroll spoke with Regish, McMillen, and a representative about whether the "third option" would provide EBTMA was sufficient funds to complete the project. Id. Ex. 1 at 69.[14] GF told Carroll that they believed the third option was feasible based upon the amount and type of work remaining on Contract #1. Id. On August 15, 2000, Carroll faxed an EBTMA-proposed takeover agreement to MSS's Bowen. Paragraph 22, as set forth below, contained a slight modification of the so-called "third option":

---

excess of the penal sum of the Bond.

Def.'s App. Ex. A, Dep. Ex. 3.

[14]     Carroll specifically testified in his deposition: "[W]hat we had begun to discuss at that point was whether or not we should insert language that's in this letter in order to make it more clear the fact that we would be willing to possibly limit the surety's liability." Def.'s App. I Ex. A at 69.

> 22. The Owner agrees that under no circumstances shall the Surety's liability exceed the penal sum of its Performance Bond. The balance of the contract price must be exhausted before the penal sum *begins to reduce*. The Surety shall not indebt the Owner to any party to pay for work in excess of the penal sum of the Performance Bond.

Def.'s App. Ex. A, Dep. Ex. 18 (emphasis added). In a letter sent along with the proposed agreement, Carroll stated that he made "one minor change in the language submitted by Mr. Thomson for grammatical purposes." Id. Carroll further stated:

> That change was made to the second sentence of paragraph number 22, "The balance of the contract price must be exhausted before the penal sum begins to reduce." The sentence submitted by Mr. Thompson read "The balance of the contract price must be exhausted before the penal sum is reduced."

Id.

EBTMA's board met on the evening of August 15, 2000, and requested additional changes to the language of the proposed takeover agreement. On August 16, 2000, Carroll sent a revised copy of the proposed takeover agreement to Bowen. That proposed copy, however, did not contain any changes to the paragraph regarding reduction of the penal sum of the bond. R.J.S.F. ¶ 21. Due to other changes in the proposed agreement, however, paragraph 22 became paragraph 20. Pl.'s App. Ex. J. Thereafter, MSS and EBTMA negotiated specifically over paragraph 20. Bowen claims that he requested Carroll to take out of the proposed agreement the second sentence of paragraph 20, which stated: "The balance of the contract price must be exhausted before the penal sum begins to reduce." Def.'s Ex. E, Bowen Aff. ¶ 4.[15] Bowen claims that he made the request "out of concern that this sentence may be argued to mean that Mid-State would not receive credit against the penal sum for monies spent in performing the

---

[15] In a faxed copy sent to Regish, Don Morosky of GF crossed out all of the language contained in paragraph 20 referencing a reduction in the penal sum. See Def.'s App. I Ex. A, Dep. Ex. 20.

work until the entire contract price had been paid out, which would mean that Mid-State would not receive credit until all of the work was complete." Id. ¶ 5.  Carroll does not specifically recall speaking with Bowen or any other MSS representative.  He, however, did recall that MSS had objections to the second sentence of paragraph 20.  Def.'s App. Ex. A at 82-83.

On August 21, 2000, Carroll sent Bowen a "final" draft of the takeover agreement. R.J.S.F. ¶ 24.  In a letter which accompanied the proposed agreement, Carroll wrote: "Please pay attention to paragraph 20.  I believe this addresses your concerns."  Paragraph 20 of the final takeover agreement stated as follows:

> 20.    The Owner agrees that under no circumstances shall the Surety's liability exceed the penal sum of its Performance Bond.  The Surety shall not indebt the Owner to any party to pay for work in excess of the penal sum of the Performance Bond.

Pl.'s App. Ex. K.  This final version of paragraph 20 deleted the second sentence that was contained in the August 16, 2000 version of paragraph 20 regarding the relationship between the contract price and the reduction of the penal sum of the performance bond.

MSS sent a signed copy of the Takeover Agreement to EBTMA on August 30, 2000.  Jt. Concise St. of Facts ("J.C.S.F.") (Doc. No. 187) ¶ 25.  In a letter sent to Regish along with the signed copy, Bowen wrote that: "Mid-State Surety, in the Takeover Agreement, has agreed to be liable to the full extent of the bond penalty above the contract balance."  Pl.'s App. Ex. C.[16]  The next day, September 1, 2000, Regish sent Bowen a signed copy of the Takeover Agreement.  Id. Ex. D.[17]  A letter enclosed with the Takeover Agreement stated: "By executing this Agreement,

---

[16]    Bowen wrote that the purpose of the letter was to "clarify any misunderstandings we may have had in the past."  Id.

[17]    Although the final Takeover Agreement states that it was "executed" August 21, 2000, that date does not seem to be the date that it was signed by all the parties.  Regish's letter dated September 1, 2000, indicates that EBTMA signed the Takeover Agreement and returned it

the Authority expects Mid-State Surety and Inland Waters to provide the necessary resources to complete the project in accordance with the terms of the contract." <u>Id</u>.  In a letter to GF vice president Donald Morosky dated October 3, 2000, Bowen wrote that EBTMA was "protected by the underlying Mid-State performance bond as well as the Takeover Agreement between Mid-State Surety and the Authority, *which provides Mid-State Surety is financially liable to the full sum of its performance bond after all contract balances are exhausted*." <u>Id</u>. Ex. E (emphasis added).

Plaintiff subsequently entered into a "Contract for Completion of Construction Contract" (the "completion contract") with Inland Waters Pollution Controls, Inc., whereby Inland Waters agreed to complete certain work not performed by Paliotta, subject to the terms of the completion contract.  Similar to Paliotta's difficulties, Inland Waters encountered numerous subsurface rock and utility interferences.  After plaintiff spent over $4.2 million on the project beyond the contract balance subsequent to the execution of the Takeover Agreement – approximately $710,000 in excess of the penal sum of the performance bond – plaintiff ordered Inland Waters to stop work on the project and brought suit asserting various claims against GF and EBTMA. R.J.S.F. ¶ 35.

## C.      March 28, 2002 memorandum opinion and additional discovery

On September 26, 2001, plaintiff brought a motion for partial judgment on the pleadings (Doc. No. 40) with respect to its declaratory judgment claim at count IX.  Plaintiff argued that the language of paragraph 20 of the Takeover Agreement was clear and unambiguous, and that it entitled Midstate to a declaratory judgment: "(i) that Mid-State's liability under the Takeover

_____

to MSS on that date.

Agreement is limited to the penal sum of the Performance Bond, $3,539,559.75 and (ii) that Mid-State is not liable for any costs to complete the project to the extent that such costs are in excess of the Performance Bond."  March 28, 2002 Mem. Op. (Doc. No. 45) at 2.  MSS argued that the specific clause in paragraph 20 that stated "under no circumstances shall the Surety's liability exceed the penal sum of its Performance Bond" required MSS to perform work under paragraph 2 of the agreement only until it paid or incurred costs equal to or in excess of the penal sum of the Performance Bond.  Id. at 3.  In contrast, EBTMA argued that paragraph 20 did not modify paragraph 2, and that MSS was obligated to complete all of the work specified in the original contract.  Id. at 4.  The court determined that the term "liability" in paragraph 20 was ambiguous. Id. at 5.  According to the court:

> . . . "the Surety's liability" in paragraph 20 could refer either to Mid-State's potential legal obligation to pay the Authority for damages upon breach of the Takeover Agreement, or the debt Mid-State would incur during performance through hiring other subcontractors to undertake the actual sewage system construction.  Because the ambiguity is contained in the meaning of liability – whether liability refers to Mid-State's *legal liability to the obligee of the performance bond* (the Authority) upon breach *or debt liability to third-party contractors* – it is not cured by the phrase "under no circumstances" and *interpretation will require an examination of extrinsic evidence such as trade usage*.  Thus, although it is possible that paragraph 20 limits the amount of debt Mid-State is obligated to accrue in the performance of the work, because the language is subject to more than one reasonable interpretation it is ambiguous and judgment on the pleadings is inappropriate.

Id. at 5-6 (emphasis added).[18]

Following the court's ruling, the parties engaged in discovery in order to aid the court in resolving the ambiguity in the Takeover Agreement.  The parties also retained experts to opine

---

[18]     In a footnote to the opinion, the court stated: "The context of the agreement may even lend some support to the Authority's interpretation that *liability* refers to *legal liability for breach*, since the paragraph preceding the one at issue discusses the prevailing party's entitlement to costs and attorneys fees in the event of litigation to enforce the Takeover Agreement."  Id. at 6 n.4.

on trade usage and custom in the surety industry regarding the language at issue in the Takeover

Agreement.  MSS retained Thomas E. Crafton, Esq. as its expert.  Mr. Crafton stated in his

expert report that a surety faced with a performance bond claim essentially has four options: (1)

to finance the bonded contractor in the bonded contractor's completion of the bonded work; (2)

to tender to the obligee another contractor along with a check for the difference between the

contract balance and the cost to complete the bonded work as determined by the completion

contract; (3) to do nothing and allow the bond obligee to complete the bonded work and look to

the surety to be reimbursed pursuant to the terms of the performance bond; and (4) to take over

the performance of the bonded work and enter into a completion contract with a relet contractor

for the completion of the bonded work.  Def.'s App. G, Dep. Ex. 313 at 3-4.  Mr. Crafton further

noted that without a clause in the contract limiting its liability, MSS would not be protected by

the penal sum of its bond, but rather would become "a completing contractor faced with the

obligations of completing the bonded work without regard to costs."  Id.

Mr. Crafton stated that the proposed agreement MSS submitted to EBTMA on July 10,

2000:

> contained conditions which every right thinking surety insists upon prior to
> entering into a takeover relationship with a performance bond obligee: obligee
> commits contract funds towards the costs of completing the bonded work
> (Takeover Agreement Paragraph #3) and the surety's liability under the Takeover
> Agreement is limited to the penal sum of the performance bond (Takeover
> Agreement Paragraph #11).  This condition (limitation or liability) is a limitation
> upon the surety's obligation to perform ". . . all work not completed under the
> Contract (Takeover Agreement Paragraph #2).["]  These essential and
> fundamental takeover agreement conditions are BLACK LETTER LAW for all
> attorneys and claim representatives involved in the handling of performance bond
> claims.  These essential conditions are prescribed by surety claim handling
> manuals of all major sureties and these essential conditions are, without
> exception, set forth in each and every FLSC publication and form agreement
> relating to surety takeovers.  No informed surety would ever enter into a Takeover

> Agreement without these essential conditions, nor would such actions be
> approved by the surety reinsurers customarily reinsuring performance bonds.

Id. at 4.[19] Mr. Crafton opined that throughout negotiations into the Takeover Agreement MSS

"relentlessly conditioned its agreement to enter into a takeover agreement upon the condition that

the penal sum of its performance bond would be 'capped.'" Id. at 4. Mr. Crafton concluded that

MSS, "in negotiating the terms of the Takeover Agreement followed precisely the standards and

practices in the surety claims industry by insisting on language which limited its completion

obligations to an amount equal to the penal sum of its performance bond." Id. at 6.

EBTMA retained Brian E. Downey as its expert. Mr. Downey stated he agreed with the

four options a surety has when faced with a performance bond claim as set forth by Mr. Crafton;

however, Mr. Downey indicated that a surety in such a situation also has a fifth option: to pay out

the penal sum and receive a release from the owner. Mr. Downey also opined that sureties

customarily attempt to cap their liability to the penal sum of the performance bond. Mr. Downey

stated, however, that takeover agreements capping the surety's liability customarily contain

additional provisions that "work in tandem with that penal sum cap" provision. Mr. Downey

concluded that the contractual language in the final Takeover Agreement did not contain the

language that is customarily utilized to limit a surety's liability to the penal sum of the

performance bond.[20]

---

[19]     The July 10, 2000 *proposed* agreement examined by Mr. Crafton was not the final
agreement entered into between the parties.

[20]     In a hearing held June 10, 2004, the court granted plaintiff's motion to strike Mr.
Downey's expert report with respect to those portions of the report that contained legal
conclusions as to: (1) whether the Takeover Agreement is ambiguous; and (2) whether MSS
breached a fiduciary duty in connection with underwriting the performance bond for Paliotta.
See Tr. of hearing held June 10, 2004, at 11. The court held that Mr. Downey's opinion as to the
Takeover Agreement would be considered to the extent it examined the custom in the surety
industry. The court, however, stated that it would not consider the report with respect to

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249.  The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d. Cir. 1956), cert.denied, 355 U.S. 964 (1956) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or *otherwise made admissible in evidence*.") (emphasis added).

---

interpreting the specific contractual ambiguity at issue, which is an issue of law for the court to determine.  Id.

*Analysis*

## I.   Contract Claims – Counts I and IX of plaintiff's complaint

### A.   The parties' interpretation of paragraph 20

The crux of the cross-motions for summary judgment concern the parties' competing interpretations of paragraph 20 of the Takeover Agreement.  Plaintiff contends that the extrinsic evidence confirms that the term "liability" in paragraph 20 refers to plaintiff's out-of-pocket obligation to expend money on the project up to the penal sum of its performance bond ($3,539,559.75), and does not refer to some ensuing obligation to EBTMA in the event the project stopped short of completion.  Pl.'s Br. in Support of Summary Judg. (Doc. No. 128) at 3, 5.  Under plaintiff's interpretation of paragraph 20, plaintiff was to receive credit against the penal sum for monies it expended in performing work during the course of the project.  In contrast, defendant argues that the term "liability" in paragraph 20 refers to plaintiff's liability upon default of the original contract, as opposed to a cap on plaintiff's overall liability with respect to the project.  Def.'s Br. in Support of Summary Judg. (Doc. No. 182) at 5.  According to EBTMA, once MSS decided to enter into the Takeover Agreement and perform work under the original contract, MSS was obligated to complete the work.[21]  EBTMA contends that

---

[21]     The court does not find merit in plaintiff's argument that defendant proffered a different interpretation of the contract earlier in the litigation, and that, accordingly, defendant is barred by the doctrine of equitable estoppel from asserting its "current" interpretation of the agreement.  Defendant's Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment on the Pleadings (Doc. No. 42) submitted to the court on October 16, 2000, consistently asserted the position that MSS was obligated to complete the work under the original contract, and that MSS would not receive any credit against the penal sum until the contract balance was exhausted.  On page 8 of its brief, defendant stated:

> Plaintiff now seeks a ruling that Paragraph 20 of the Takeover Agreement "caps" its liability.  The language of the provision does nothing more than maintain the limit on Mid-States's liability for payment of a penal sum.  Mid-States [sic] proposed construction of the paragraph would vitiate Paragraph 2, *which requires that the project be completed.*  Thus, *the only reasonable reading of the contract*

paragraph 20 meant that, if MSS did not complete work under the contract, MSS was "liable to the full extent of its payment bond, but no more." Id. at 6.[22]

## B.   Pennsylvania Contract Law

In order to decide whether summary judgment is appropriate with respect to either of the parties' competing interpretations, the court will first proceed with an analysis of pertinent

---

> *as a whole would apply the cap to a situation where Mid-State defaults under the completion contract and becomes liable once again for payment of the penal sum.* Thus, even if Mid-State performs negligently or defaults, *Mid-State's original liability will not increase.* This reasonable interpretation would not permit Mid-State to count invoices and stop work on completion of the project, and also would not result in the unreasonable reading out of the contract the requirement that the *contract be completed by Mid-State.*

Def.'s Br. at 8 (emphasis added). On page 10 of its brief, defendant further stated:

> [A] reasonable construction of this provision is that, if Mid-State defaults in completion, then Mid-State will not be called upon to pay any more than the penal sum. Hence, its "liability" under the performance bond would not have changed, even though it may have expended some monies in attempting completion.

Id. (emphasis added). Finally, page 11 of defendant's brief states:

> Plaintiff seeks a ruling that it is entitled to add up the monies expended in attempting to complete performance, and to simply stop when that amount reaches the penal limit on the bond. This is not a reasonable interpretation of the language at issue. Instead, the only reasonable interpretation of the provision, one that gives effect to Paragraph 2 of the agreement, would apply paragraph 20 *in the event of a default by Mid-State.*

Id. (emphasis added).

[22]   The parties' competing interpretations can also be viewed as turning on the issue of timing. Both parties agree that there is some form of a "cap" on plaintiff's "liability." The parties disagree, however, on the point at which plaintiff's liability is triggered under the Takeover Agreement. Under defendant's interpretation, plaintiff's "liability" is triggered upon default of its contractual obligations under the Takeover Agreement. Thus, regardless of the amount of money plaintiff spends in an attempt to complete the project, once a breach occurs MSS is liable for the penal sum of its performance bond. Under plaintiff's interpretation, however, its "liability" began at the point in which it expended costs in excess of the remaining contract balance. Once the threshold of the remaining balance was passed, plaintiff asserts that it could be liable up to the amount of the penal sum, but no more.

Pennsylvania law regarding contract interpretation.[23]   The goal of contract interpretation is "to discover the parties' objective mutual intent."  Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 613 (3d Cir. 1995).  In undertaking the interpretation of a contract under Pennsylvania law, the court must begin with the language of the contract itself.  Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. Ct. 1982) (stating that it is "fairly settled" that "the intent of the parties to a written contract is contained in the writing itself.").  Pennsylvania law follows the presumption that "the parties' mutual intent can be ascertained by examining the writing."  Duquesne Light Co., 66 F.3d at 613.  Thus, "[w]here the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence."  Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982); see also Mellon Bank N.A. v. Aetna Business Credit, 619 F.2d 1001, 1009 (3d. Cir. 1980) ("The strongest external sign of agreement between contracting parties is the words they use in their written contract.").

There is an exception to this general principle: if the court determines that a contract is ambiguous, the parties are permitted to introduce extrinsic evidence in order to resolve the ambiguity.  Mellon Bank, 619 F.2d at 1011 (3d. Cir. 1980).   The threshold question of whether the contract is ambiguous is an issue of law for the court to decide.  Id.  If the court finds the contract is ambiguous, the ambiguity must be resolved by the trier of fact.  Id; see Tigg Corp. v. Dow Corning Corp., 822 F.2d 358 (3d Cir. 1987) (district court erred in granting motion for summary judgment because contract was ambiguous and extrinsic evidence should have been admitted to trier of fact to resolve ambiguity).

---

[23]      Paragraph 22 of the Takeover Agreement states that Pennsylvania law governs the contract.  Pl.'s App. Ex. 1.

Because the threshold determination of whether a contract is ambiguous is a province of the court, courts have developed points of reference to aid in making the determination whether a contractual term is ambiguous.  For example, the United States Court of Appeals for the Third Circuit, interpreting Pennsylvania law, stated that a contractual term is ambiguous:

> if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.

Duquesne Light Co., 66 F.3d at 614.  The court must consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning" in determining whether a term is ambiguous.  Mellon Bank, 619 F.2d at 1011.  Additionally, the court must interpret "trade terms, legal terms of art, numbers, common words of accepted usage and terms of a similar nature . . . in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent."  Id. at 1013.

The party asserting that a contractual provision is ambiguous may resort to extrinsic evidence to support its claim that a specific term or phrase is a latent ambiguity.  Bohler-Uddeholm America, Inc. v. Ellwood Group, 247 F.3d 79, 93 (3d. Cir. 2001).[24]  The extrinsic

---

[24]     There are two types of ambiguities.  A patent ambiguity is one that appears on the face of the contract and is the result of defective or obscure language.  Baney v. Eoute, 784 A.2d 132, 136 (Pa. Super. Ct. 2001).  A patent ambiguity is "apparent just from reading the contract without having to know anything about how it interacts with the world."  RICHARD A LORD, 11 WILLISTON ON CONTRACTS § 33:40 (4th ed.)  In contrast, a latent ambiguity "arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous."  Duquesne Light, 66 F.3d at 614.  The Pennsylvania Supreme Court stated that "[t]he usual instance of a latent ambiguity is one in which a writing refers to a particular person or thing and is thus apparently clear on its face, but upon application to external objects *is found to fit two or more of them equally*."  Steuart, 444 A.2d at 663 (citations omitted, emphasis added).  The distinction between patent and latent ambiguities has been deemphasized:  "[a]s the law changed and began to emphasize content over form . . . .  Coincident with this change in focus has been a significant decline in

evidence, however, cannot be utilized "to show that the parties intended something different that was not incorporated into the contract." Id.  In other words, the ambiguity inquiry must be about the parties' objective "linguistic reference."  Id. at 93.  When determining whether a latent ambiguity exists, "the parties' expectations, standing alone, are irrelevant without any contractual hook on which to pin them." Duquesne Light Co., 66 F.3d at 614-15 n.9.  Instead, "a party offers the right type of extrinsic evidence for establishing latent ambiguity if the evidence can be used to support 'a reasonable alternative semantic reference' for specific terms contained in the contract." Bohler, 247 F.3d at 94 n.3 (quoting Mellon Bank, 619 F.2d at 1012 n.13).  Thus, extrinsic evidence presented to establish a latent ambiguity may be used to support an alternative interpretation of a term that "sharpens" the term's meaning, but may not be used to support an interpretation that "completely changes" the meaning of the term.  Bohler, 247 F.3d at 95 n.4.[25]

The approach utilized by the United States Court of Appeals for the Third Circuit in Bohler to determine if a contractual term was ambiguous is instructive.  In Bohler, the parties entered into an agreement to establish a joint venture to manufacture steel ingots.  The joint

_____

the importance of the distinction between latent and patent ambiguities.  Many courts now concur that the distinction is largely 'an unprofitable subtlety.'" Richard A. Lord, 11 Williston on Contracts § 33:40 (4th ed. 2004).  While the court in the memorandum opinion dated March 28, 2002, did not specifically identify the ambiguity in this case as a latent ambiguity, it is apparent to the court that the ambiguity was considered latent.

    [25]    The court of appeals in Bohler further stated that Pennsylvania law established that:

> (1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous; (2) each party's proffered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning.

Id. at 94-95.

venture was primarily formed: (a) to allow the defendant to produce its own supply of steel

ingots; and (b) to permit the plaintiff, a Swedish corporation, to avoid steel import quotas. Id. at

87.  The contract specified that the parties would pay for the joint venture's overhead costs in

accordance with the percentage each partner controlled in the joint venture.  One clause in the

agreement specified that the defendant could receive a rebate from the joint venture if the amount

of steel it "purchased" from the joint venture exceeded the defendant's allotted overhead

percentage. Id. at 87.[26]  After the plant commenced operation, a dispute arose between the parties

over the proper interpretation of the term "purchases" in the joint venture agreement.  The

defendant argued that buying ingots from the joint venture and reselling them to third parties

constituted a "purchase" under the agreement.  Id. at 88.  In contrast, the plaintiff asserted that the

joint venture sold the ingots directly to third parties at the defendant's direction, and that the

defendant was not entitled to a rebate on such "purchases." Id.

The district court determined that the agreement was ambiguous with respect to the

plaintiff's right under the contract to receive rebates on the basis of sales to third parties, and the

jury determined that the plaintiff breached the agreement by including third party ingot sales in

its rebate calculations. Id. at 90.  Upon review of the district court's determination that the

contract was ambiguous, the court of appeals affirmed.  The court of appeals first examined the

---

[26]      The Agreement specifically provided as follows:
 § 2.3 Price Adjustment or Rebate for Contribution.  Within 90 days after the end
of each calendar year of Seller [EUS], the prices with respect to the purchase of
Products during the preceding calendar year by Buyer [Ellwood] shall be adjusted
by way of rebate (after giving effect to quarterly estimated allowances) if Buyer's
*Purchases* (net of returns and allowances) in any year constitute more than 80% of
the aggregate amount received by Seller in such year in excess of aggregate above
defined "base costs" for such year (hereinafter for this Section 2.3 referred to as
"Contribution").
Id. at 92 (emphasis added).

plaintiff's proffered "contractual hook," which was that the term "purchases" in the agreement was ambiguous. The court of appeals noted that the plaintiff pointed to several provisions in the joint venture agreement and the business plan that could become meaningless if the defendant's interpretation was accepted. Id. at 97-98. The court of appeals also examined language that the defendant proposed during negotiations but was rejected by the plaintiff and did not become part of the final business plan and agreement. Id. at 98 n.5.[27] Because the court of appeals determined that the plaintiff's "proffered interpretation of these sections does not contradict the common meaning of the terms contained therein but merely narrows those meanings," the court next examined extrinsic evidence offered by the plaintiff to support its alternative interpretation of the contract. Id. at 98. The extrinsic evidence reviewed by the court of appeals consisted of: (1) testimony of the plaintiff's general counsel regarding the negotiation of the agreement; (2) a proposed business plan the defendant sent to the plaintiff which stated that the primary purpose of the joint venture was to supply ingots to its owners, not to third parties; (3) evidence that all references to "third party purchasers" were deleted in the final version of the agreement; and (4) an affidavit submitted by the plaintiff's president regarding his understanding as to when the defendant was permitted to sell ingots to third parties under the agreement. Id. at 98-99. The court of appeals concluded that the extrinsic evidence the defendant offered in support of its interpretation "supports its reasonable alternative interpretation of the agreement." Id. at 99-100. Thus, the court of appeals held that the district court was correct in determining that the

---

[27]    See also Mellon Bank, 619 F.2d at 1014 (court stated that where clause the plaintiff demanded to be excluded during negotiations was contained in final agreement, and where the plaintiff signed agreement notwithstanding inclusion of the clause, the plaintiff "became bound by the usual meaning" of the clause).

agreement was ambiguous and submitting the issue of the proper interpretation of the contract to the jury to decide.  Id. at 100.

In summary, in determining whether the term "liability" is ambiguous in this case, the court must decide whether the party's proffered "contractual hook" contradicts the common meaning of the term or narrows its meaning.  If the interpretation narrows the term's meaning, the court may then consider extrinsic evidence offered by the party to establish a latent ambiguity.  If such evidence supports a reasonable alternative interpretation of the agreement, the court may find the contract to be ambiguous.  If the contract is ambiguous, the court cannot grant summary judgment as a matter of law, and the finder of fact will ultimately have to weigh at trial the evidence offered by the parties in support of their respective interpretations and determine the proper interpretation of the contract.

### C.   The term "liability" in the Takeover Agreement is ambiguous and the trier of fact will have to resolve the ambiguity

Applying the above principles of Pennsylvania contract law to the present dispute, the court must first determine whether the term "liability" in the Takeover Agreement is ambiguous.  The court begins its analysis at the appropriate starting point: by examining the language of the agreement itself.  In this respect, the Takeover Agreement contains the following pertinent provisions:

> WHEREAS, the *Owner desires to effect the completion of said Contract* in order to preserve the work in place and to expedite completion and to avoid delays and inconvenience; and

> WHEREAS, the *Surety is willing to exercise its election to complete the Contract* as a measure of cooperation with the Owner providing Surety can be assured that in doing so, it will receive the Contract payments as hereinafter set forth.

* * * *

2.      The Surety agrees to perform or procure *the performance of all work to be completed or corrected in accordance with the terms and conditions of the Original Contract* and approved change orders thereto and its Performance and Payment Bonds, *the terms and conditions of which are incorporated herein by reference.*

3.      The Owner acknowledges that the Surety shall receive all contract proceeds upon completion of the work covered by the Contract in the manner specified by the Contract.  Accordingly, the Owner acknowledges that the remaining Contract balance, as of the date of the signing of the Agreement, for the completion of the contract is $2,575,270.05.

* * * *

11.     The parties to this Agreement accept that this Takeover Agreement should not be construed to waive, limit, alter or amend any of the parties obligations, rights, defenses or liabilities under the Bond or the Contract.

* * * *

15.     If, for any reason, the terms and conditions of this Takeover Agreement conflict with the requirements, rights, obligations or responsibilities enumerated under the Contract, then the terms and conditions of the Contract shall supersede this Agreement.

16.     This Takeover Agreement constitutes the entire agreement between the parties for purposes of the takeover of this project only.  The contract entered into between the Owner and the principal remains in full force and effect.

* * * *

19.     In the event of litigation to enforce the terms of this Takeover Agreement, the substantially prevailing party shall be entitled to its costs, including reasonable attorney fees to the extent permitted by law.

20.     The Owner agrees that under no circumstances shall the Surety's *liability* exceed the penal sum of its Performance Bond.  The Surety shall not indebt the Owner to any party to pay for work *in excess of the penal sum of the Performance Bond.*

Pl.'s App. Ex. A (emphasis added).

EBTMA contends that the meaning of the term "liability" is apparent from the term's plain meaning and the language in the corresponding provisions of the contract. According to EBTMA, several provisions in the Takeover Agreement clearly mandate MSS to complete Contract #1, and that, to accept MSS's interpretation of "liability" would be to nullify those express provisions of the Takeover Agreement that require MSS to complete Contract #1. See Second Federal Savings and Loan Ass'n v. Brennan, 592 A.2d 997, 1000 (Pa. Super. Ct. 1991) (stating that one part of a contract cannot be read to annul another part of the contract, and that a contract must be construed, if possible, to effect all of its terms). In addition, EBTMA asserts that the inclusion of paragraph 20 immediately following paragraph 19 (which addresses litigation between the parties over the Takeover Agreement) indicates that, if MSS fails to complete the contract, MSS's liability to EBTMA upon default of its contractual obligations is capped at the penal amount of its performance bond. EBTMA argues that this is a reasonable interpretation of the Takeover Agreement, especially because MSS would be responsible to complete the project regardless of cost once it entered into the Takeover Agreement in the absence of a limitation of liability clause. See In re Modular Structures, Inc., 24 F.3d 72, 74 n.1 (3d Cir. 1994). Finally, EBTMA asserts that the parties' conduct during the course of performance of the contract – specifically the letters sent by Bowen to Regish on August 30, 2000, and to Morosky on October 2, 2000 – compels its proffered interpretation of the contract term. See Pennsylvania Engineering Corp. v. McGraw-Edison, Co., 459 A.2d 329, 332 (Pa. 1983) (stating that the parties' post agreement conduct is relevant to aid in contract interpretation irrespective of whether the contract is ambiguous).

MSS contends that the term "liability" is not clear and unambiguous under the plain meaning and context of the agreement. In support of its argument, MSS asserts that paragraph 20

is a specific contractual provision that qualifies the general requirements in the "whereas" clause and paragraph 2 to complete the work under the contract.  See PBS Coal, Inc. v. Hardhat Mining, Inc., 632 A.2d 903, 906 (Pa. Super. Ct. 1993).  This interpretation is MSS's so-called "contractual hook" in support of its argument that its proffered interpretation "does not contradict the common meaning of the terms contained therein but merely narrows those meanings." Bohler, 247 F.2d at 98.  MSS argues that extrinsic evidence clearly establishes its proffered interpretation of the term.  Id. at 97 (stating that, when faced with the threshold question of whether the contract is ambiguous, "Pennsylvania law both requires that the court interpret the language without using extrinsic evidence, *and* allows the court to bring in extrinsic evidence to prove latent ambiguity").

Proceeding to the specific term in dispute, the term "liability" is defined by Black's Law Dictionary as follows:

> **liability,** *n.* **1.**  The quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment. . . . **2.** (*often pl.*) A financial or pecuniary obligation.

BLACK'S LAW DICTIONARY 932 (8th ed. 2004).  Under this definition, the term "liability" could reasonably refer to either of the competing interpretations offered by the parties: plaintiff's total financial obligation to defendant after default, no matter what amount of money plaintiff spent in an unsuccessful attempt to complete the contract (defendant's interpretation); or plaintiff's total out-of-pocket obligation to spend up to the penal sum of its performance bond, rather than some ensuing obligation to defendant in the event the project stopped short of completion (plaintiff's interpretation).  The major defect of paragraph 20 is that the phrase "Surety's liability" is not qualified by any language that could aid the court in interpreting its meaning.  Furthermore, examining the context of the agreement, it is unclear whether paragraph 20 is a specific

contractual provision that trumps the general requirement for plaintiff to complete all work under the terms of the original contract.  In this respect, the court agrees with the earlier assessment made in connection with the motion to dismiss that the plain meaning of the term "liability" is ambiguous under the reasonable competing interpretations of both parties.  See Duquesne Light, 66 F.3d at 614 (stating that a contractual term is ambiguous if it is "reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning").

Furthermore, evidence of trade usage advanced by the parties does not clear up the ambiguity.  See Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189, 1193 (Pa. 2001) ("custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract").  Neither party disputes that when a contractor defaults under the terms of its contract, its surety generally chooses one of two options: (1) pay the penal sum of the performance bond; or (2) enter into a takeover agreement and perform the work of its principal.  See also March 28, 2002 Mem. Op. at 4 (citing, DEUTSCH, KERRIGAN & STILES, CONSTRUCTION INDUSTRY INSURANCE HANDBOOK § 166.4 (1991)).  If the surety elects to perform the work of its principal in order to reduce its potential costs –  i.e., attempts to complete the project for less than it would cost to simply remit to the project owner the penal sum of the performance bond – the surety is liable without regard to the penal sum unless it is able to obtain a clause in the takeover agreement "limiting the surety's liability in the course of performance to the original bond penalty."  International Fidelity Ins. v. County of Rockland, 98 F.Supp.2d 400, 429 (S.D.N.Y. 2000).  That kind of clause, if it appears in a takeover agreement, is known as an "absolute limitation on liability to the penal sum of the bond."  Id. at 430.

In support of their respective positions, both parties retained experts with respect to trade usage.  Both experts acknowledged the risk-reward position of a surety electing to enter into a takeover agreement to complete the work of its defaulting principal.  Both experts further stated that sureties attempt to include clauses in the takeover agreement that cap the surety's absolute liability to the penal sum of the performance bond.  Neither expert, however, expressed a clear opinion as to whether an established trade usage exists with respect to the word "liability."  Thus, although both parties' experts agree that sureties often attempt to limit their total costs under takeover agreements to the penal sum of the performance bond, it remains uncertain whether plaintiff was able to accomplish that goal within the confines of the specific agreement at issue in this case.  Therefore, the court finds that the term "liability" is ambiguous.

This determination that the term is ambiguous is further supported by extrinsic evidence revealed through discovery.  Bohler, 247 F.2d at 97.  The parties engaged in extensive discovery into the bargaining history and subsequent conduct of the parties pursuant to the Takeover Agreement in an attempt to determine the meaning of the term "liability" in paragraph 20.  The extrinsic evidence set forth in part II.A., supra, reveals that MSS, throughout the bargaining process in the form of contract proposals and letters to EBTMA and GF, insisted that its liability had to be capped at the penal sum of its performance bond.  MSS initially proposed language which clearly stated that MSS would receive credit for payments made in excess of the remaining balance under the contract.  RUS, however, determined that this language was "unacceptable." Throughout the negotiating process, RUS – which had to give its approval to the agreement as EBTMA's governmental source of funding – was steadfast that the Takeover Agreement could not contain any language creating an absolute cap on MSS's liability that could threaten the completion of the project.  Thus, EBTMA's first proposed takeover agreement did not contain

any limitation of MSS's liability as to the penal sum amount.  MSS responded by stating the

limitation of liability clause was required to reach an agreement.

In an attempt to undue the stalemate, the parties explored the so-called "third option."

Under this option, EBTMA examined whether there was enough coverage under the contract

balance (approximately $2.5 million) and the penal sum of the performance bond ($3.5 million)

to complete the project.  MSS proposed the following language be inserted into the Takeover

Agreement under the "third option:"

> Obligee agrees that under no circumstances shall Surety's liability exceed the
> penal sum of its Performance Bond.  The balance of the contract price must be
> exhausted before the penal sum *is reduced*.  Surety shall not indebt Obligee to any
> party to pay for work in excess of the penal sum of the Performance Bond.

Def.'s App. Ex. A, Dep. Ex. 15 (emphasis added).  Under this option, MSS would receive credit

and the penal sum would be reduced with respect to payments made by MSS for work that was

not reimbursed under the original contract.  EBTMA's attorney proposed the following

paragraph, which contained a minor grammatical change that significantly altered MSS's

proposed language:

> The Owner agrees that under no circumstances shall the Surety's liability exceed
> the penal sum of its Performance Bond.  The balance of the contract price must be
> exhausted before the penal sum *begins to reduce*.  The Surety shall not indebt the
> Owner to any party to pay for work in excess of the penal sum of the Performance
> Bond.

Def.'s App. Ex. A, Dep. Ex. 18 (emphasis added).  The "slight modification" in effect suggests

that MSS would not receive any credit with respect to its penal sum until the balance of the

contract price was exhausted.  See Def.'s Ex. E, Bowen Aff. ¶ 5.[28]  Thereafter, MSS and EBTMA

negotiated over the second sentence to paragraph 20.

Ultimately, that sentence was left out of the final agreement in its entirety.  Paragraph 20

of the Takeover Agreement stated:

> 20.   The Owner agrees that under no circumstances shall the Surety's *liability* exceed
> the penal sum of its Performance Bond.  The Surety shall not indebt the Owner to
> any party to pay for work *in excess of the penal sum of the Performance Bond.*

Pl.'s App. Ex. A (emphasis added).  The flurry of letters sent between the parties after this final

proposal reveals a textbook case for concluding that the term "liability" is ambiguous.  EBTMA

sent MSS a letter along with the final proposed language which stated: "Please pay attention to

paragraph 20.  I believe this addresses your concerns."  This letter creates an objective inference

that the term "liability" is ambiguous based upon the prior bargaining history of the parties, and it

cuts against EBTMA's argument that the term clearly and unambiguously: (1) required MSS to

complete the contract prior to receiving credit against the penal sum; and (2) required MSS to

spend out-of-pocket costs in excess of the penal sum.  The extrinsic evidence also supports an

inference that EBTMA's interpretation of the agreement is "unreasonable" because, under its

interpretation of the agreement, MSS would never earn *any* credit under its penal sum.  See Pl.'s

Br. in Opp. (Doc. No. 149) at 9.

The extrinsic evidence, however, also undercuts plaintiff's interpretation of the

agreement.  For example, although EBTMA sent MSS a proposal containing the "third option"

which at the very least capped MSS's total liability, that language was not included in the final

---

[28]       Despite whether plaintiff would receive any credit against its penal sum under this
proposal, the proposal did appear to cap plaintiff's absolute liability to the penal sum of the
performance bond.

agreement.  In <u>Bohler</u>, the court of appeals found persuasive the fact that language which was contained in a draft agreement was left out of the final agreement.  <u>Bohler</u>, 247 F.3d at 99.  The omission, according to the court of appeals, supported an inference that such an interpretation was not supported by the final agreement.  <u>Id</u>.  Likewise, the fact that the "third option" was left out of the final agreement supports an inference that it did not become part of the final agreement.

In the end, a review of the language of the agreement and the extrinsic evidence set forth by the parties leads the court to conclude that the term "liability" in paragraph 20 of the Takeover Agreement is ambiguous.  At this stage in the proceedings, the function of the court is to determine whether there is an ambiguity in the Takeover Agreement, not to offer an opinion as to which of the competing interpretations is ultimately correct.  That is a function for the trier of fact to determine at trial.  <u>Mellon Bank.</u>, 619 F.2d at 1011.  It is sufficient at this point for the court to determine that each of the competing interpretations of the agreement are reasonable, and that the term "liability" is reasonably susceptible of at least two different meanings.  Accordingly, because the court finds that the term "liability" in the Takeover Agreement is ambiguous, the court will deny the parties' cross-motions for summary judgment on counts I and IX.


**II.     Unjust Enrichment and Equitable Rescission Claims – Counts IV and XII**

Plaintiff brought a claim for unjust enrichment at count IV of its complaint.  Plaintiff alleged in count IV that it performed work and provided materials, labor and services for the benefit of EBTMA, and that EBTMA was unjustly enriched at plaintiff's expense.  Pl.'s Compl. (Doc. No. 1) ¶¶ 22-26.  Both parties agree that plaintiff may not maintain an unjust enrichment

claim where a written contract exists between the parties.  See Mitchell v. Moore, 729 A.2d

1200, 1203 (Pa. Super. Ct.).  Thus, plaintiff cannot maintain an unjust enrichment claim at count

IV in connection with its breach of contract claim.

Plaintiff, however, contends that it may maintain an unjust enrichment claim with respect

to the fraud claim at count X of the amendment to plaintiff's complaint.  Count X alleges that

defendants GF and EBTMA fraudulently induced Paliotta to bid for Contract #1, for plaintiff to

issue performance and payment bonds on Contract #1, and for plaintiff to enter into the Takeover

Agreement.  Amdt. to Pl.'s Compl. (Doc. No. 96) ¶¶ 30-31.  Plaintiff argues that if Contract #1 is

rescinded based upon fraud, plaintiff could recover damages, inter alia, under a claim of unjust

enrichment.  See Shulman v. Continental Bank, 513 F.Supp. 979, 986 (E.D. Pa. 1981) (denying

motion for summary judgment with respect to unjust enrichment claim where material issue of

fact existed as to whether underlying agreement was enforceable).

The court agrees with plaintiff's position.  Plaintiff is permitted to maintain claims for

fraud and breach of contract at this stage of the proceedings because the claims, the rights

asserted, and the relief requested are not the same.  See Cunningham v. Joseph Horne Co., 176

A.2d 648, 650-51 (Pa. 1961).  There is a distinction between election of inconsistent remedies

and election of a particular legal theory to pursue a claim, and a plaintiff "should not be forced to

elect a particular legal theory in pursuing a claim" prior to trial.  Schreiber v. Republic

Intermodal Corp., 375 A.2d 1285, 1291 (Pa. 1977).  Thus, plaintiff is permitted to maintain both

its breach of contract claim and fraud claims.  To the extent that plaintiff is successful on both

claims at trial, plaintiff will have to make an election of remedies so as to avoid double recovery.

Wedgewood Diner, 534 A.2d 537, 538 (Pa. Super. Ct. 1987) (stating that where a plaintiff

alleges it was defrauded in a contract, the plaintiff may either (1) rescind the contract and recover

restitution damages or (2) affirm the contract and recover damages on the basis of the fraud); see also Jiffy Lube International, Inc. v. Jiffy Lube of Pennsylvania, Inc., 848 F.Supp. 569, 576-77 ("[u]nder [the doctrine of election of remedies], a party alleging fraud in connection with the formation of a contract has a choice: the party may either disaffirm the contract and tender back the consideration received, or affirm the voidable contract and waive the fraud.").  Plaintiff may pursue both claims and is not required to make an election of remedies prior to or at trial.  Craige v. General Motors Corp., 740 F.Supp. 353, 359 (E.D. Pa. 1990).  Accordingly, because plaintiff is permitted to maintain its fraud claim for rescission of Contract #1 and the Takeover Agreement, defendant's motion for summary judgment with respect to count IV is denied.

Count XII states a claim for equitable rescission of the Takeover Agreement.  In accordance with the rationale set forth above, the court will also deny defendant's motion for summary judgment with respect to count XII.

### III.     Negligence – Count V

Count V of plaintiff's complaint contains a claim for negligence against EBTMA.  In its response to defendant's motion for summary judgment, plaintiff consented to dismissal of count V.  Accordingly, the court will grant defendant's motion for summary judgment with respect to count V.

### IV.     Negligent Misrepresentation, Fraud, and Civil Conspiracy  Claims – Counts VII, X, and XI

Counts VII, X, and XI of plaintiff's complaint contain claims, respectively, for negligent misrepresentation, fraud, and civil conspiracy.  Plaintiff's fraud and negligent misrepresentation claims allege that defendant: (1) inaccurately marked utility lines on plans; (2) failed to comply

with the request by RUS to place a "caution note" on the plans; (3) failed to disclose the potential

for wildcat sewer lines; and (4) failed to update utility markings pursuant to the One Call Act.

With respect to the pending motion for summary judgment as to counts VII, X, and XII, EBTMA

and plaintiff adopted the arguments set forth by plaintiff and GF regarding GF's motion for

summary judgment.  In the memorandum opinion ruling upon GF's motion dated June 30, 2005,

the court examined plaintiff's particular fraud and negligent misrepresentation claims in great

detail.  The court granted summary judgment in part in favor of GF with respect to plaintiff's

fraud, civil conspiracy, and negligent misrepresentation claims regarding private wildcat sewer

lines and GF's alleged failure to comply with the One Call Act 90 days prior to the bid date.  In

all other respects, GF's motion for summary judgment on the fraud and negligent

misrepresentation claims was denied.  For the reasons set forth in the court's June 30, 2005

memorandum opinion and summarized above, the court will grant this defendant's motion for

summary judgment in part as to plaintiff's fraud, civil conspiracy, and negligence claims

regarding the private wildcat sewer lines and defendant's alleged failure to comply with the One

Call Act 90 days prior to the bid date.  See Travelers Cas. & Sur. Co. v. Castegnaro, 772 A.2d

456, 460 (Pa. 2001) ("In the context of vicarious liability, a principal is liable to third parties for

the frauds, deceits, concealments, misrepresentations, torts, negligent acts and other malfeasances

of his agent, even though the principal did not authorize, justify, participate in or know of such

conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the

agent's scope of employment").  In all other respects, defendant's motion for summary judgment

for the claims set forth in counts VII, X, and XI will be denied.

*Conclusion*

**AND NOW**, this 29th day of July 2005, upon consideration of the cross-motions for summary judgment filed by plaintiff Mid-State Surety Corporation and defendant East Bethlehem Township Municipal Authority, **THE COURT ORDERS AS FOLLOWS:**

- Defendant's motion for summary judgment is **DENIED** with respect to counts I (breach of contract) and IX (declaratory judgment).

- Plaintiff's motion for partial summary judgment is **DENIED**  with respect to counts I (breach of contract) and IX (declaratory judgment).

- Defendant's motion for summary judgment is **DENIED** with respect to counts IV (unjust enrichment)  and XII (equitable rescission) which plaintiff represents are based upon defendant's alleged fraud.

- Defendant's motion for summary judgment is **GRANTED** with respect to count V (negligence).

-  Defendant's motion is **GRANTED IN PART** with respect to plaintiff's claims in counts VII (negligent misrepresentation) , X (fraud), and XI (civil conspiracy) regarding defendant's alleged misrepresentations as to wildcat sewer lines and defendant's alleged failure to follow the One Call Act and **DENIED** in all other respects.

By the court:

_____
Joy Flowers Conti
United States District Judge

37

cc:    Scott D. Cessar
        Eckert, Seamans, Cherin & Mellott
        600 Grant Street
        44th Floor
        Pittsburgh, PA 15219

        Thomas M. Falucca
        3400 East LaFayette
        Detroit, MI 48207

        Paul M. Mannix
        Mark J. Gesk
        Wayman, Irvin & McAuley
        1624 Frick Building
        Pittsburgh, PA 15219
        Michael J. Witherel
        966 Perry Highway
        Pittsburgh, PA 15237

        Peter H. Thomson
        618 Beaver St.
        Suite 202
        P.O. Box 325
        Sewickley, PA 15143